May I please the court? My name is Yolanda Rutledge Jarman and I was court appointed to represent Mr. Danhach in the instant case. This case is about an illegal search and seizure that took place at a warehouse owned by Mr. Danhach in Houston, Texas. Mr. Danhach filed a motion to suppress at the district court level. That motion was denied and that's why we're here today. The seminal case on this issue is Bowie. In Bowie, the Supreme Court emphasized that this kind of sweep, as the officers alleged they conducted a protective sweep of the warehouse, is not to be a full search of the premises but extends only to a cursory inspection of those spaces where a person may be found and that that protective sweep search should last no longer than is necessary to dispel the reasonable suspicion of danger. In the instant case, the officers argue that, first of all, Mr. Kare, Mr. Kare, Alex Kare, a co-defendant working at the warehouse, consented to allowing them to search the premises. However, the government, in a reply motion to the district court, Fifth Circuit Court of Appeal number page 57 and 1527 and 1528 admits that there was no consent to enter the warehouse. And in order to conduct a lawful protective sweep, there must be a lawful entry first. Here, there's evidence that Mr. Kare did not allow them to consent. At the district court level on page 93 of the transcript from the motion to suppress, the court asked Officer Schneider, the key agent in charge, the court asked specifically, tell me again the purpose of your going to the warehouse on March 1st. The witness, Officer Schneider, says the purpose was to find additional witnesses who could corroborate evidence of any illegal activity. On page 94, the court asked the case investigator again, when you say that Mr. Kare admitted you into the office, how did he admit you into the office? This testimony is key. On page 94 of the motion to suppress, Agent Schneider says, he opened the door and then we walked in and began talking to him. This is not evidence of consent in this case, and the government has the burden to bear in proving consent. Yes, sir? Other testimony, tell me if this was said and how you respond to it. There's testimony that Kare indicated he was in charge of the facility. When asked if anybody else was inside, he said one of his workers. Schneider then said, may we, can we go back to where he is? And Kare said, yes. That's not consent to go back into that location? No. Here, we argue that first of all Do you agree that testimony is there? That testimony is there, but that's a disputable testimony because if you look, the chief evidence in this case was defense exhibit one. It's a video that was introduced at the district court level on a USB drive. This court has it on CD. When they walk up the sideway to enter the warehouse, you can see that as Mr. Kerr immediately opens the door, the agents just walk in around Mr. Kerr simultaneously and enter the warehouse. So there's no question of can they enter. And if you will note in my brief, I cite two cases from the Ninth Circuit, United States v. Shabu and United States v. Miller, where similar incidents have occurred where a defendant opened the door to his home and the agent just followed the defendant in without asking for consent to enter. And in those cases, the Ninth Circuit refused to infer consent. We understand that the Ninth Circuit is not binding on this court, but we're asking that you would look to those cases as illustrative on this point. Your threshold position is that they didn't have consent even to come in, then the protective sweep wouldn't even apply, right? Exactly. We first argued that there was no consent. And then the government argues that that was a protective sweep. But we say to the district court in the motion to suppress, we don't even get to that point, as you say, Your Honor, because there was no consent. You have two agents at the motion to suppress and during the trial, Agent Arceola and Agent Snyder, who both say that there was no consent given and the Agent Arceola, a female agent, was in charge of the investigation. It may not be that clear, the record. The statement I made a note of was the question to Snyder. I asked him if we could search the warehouse and he told me yes. So Snyder said I asked him if he could search the warehouse and he told me yes. How isn't that a That's Snyder's version of the events. But we're arguing that even before you get to that point, at the door of the warehouse, there was no consent. Once the agent walked into I understand that. But therefore, once if you don't prevail on that testimony like this would allow the subsequent search of the whole place. At least it would allow affirming a district court finding of that if it's debatable or you don't think he's credible. Well, in this case, the agent says to the district court that he opened the door and then we walked in. So therefore, there would be no consent. And so once he passes, this is happening so, so fast. Once the court takes a look at the video, if it hasn't already, you will see that it happens so fast. The entry between the doorway and the area that that they're called the warehouse is a very, very short couple of steps. So by the time he passes, Mr. Kerr, I guess I'm trying to say for you to prevail, it's critical that you win at that threshold can't come in in the first place because the subsequent testimony is at least leads to the inference to support the district court finding that he then consented to a full search. Exactly. There's no there's no consent as he enters. And again, if the Mr. Kerr and about three or four agents behind Mr. Kerr following Mr. Kerr into the warehouse and with respect to the to the plane view argument, um, our situation or our argument is this. First of all, there was no reason to be there. So he would have had to have a legitimate reason to be there. And in order to conduct a protective sweep of the warehouse, there would have had to be some possibility of reasonable suspicion or belief that that was danger in that warehouse. And then back to page 93 of the motion to suppress the court asked Agent Snyder. So tell me again, why were you there? We wanted to look, the agent says, for illegal activity. Now, in this case, all of the accounts that were alleged in the indictment have to do with the interstate transportation of stolen goods. There's no history of criminal activity that is dangerous. They did not say they were looking for a dangerous person, anyone with a weapon. As a matter of fact, the agents even indicated that a month before the search of this warehouse, they had conducted surveillance. They had seen a person and Mr. Kerr going back and forth into the warehouse at no time that they tried to stop Mr. Kerr or this the individual worker in the warehouse. And at no time did they indicate that they saw a weapon or anything in that warehouse that would lead them to believe that there was danger. And so there's no protective sweep that's lawful because there's no danger, no danger there. As a matter of fact, even under the protective sweep analysis, you're only supposed to stay there. The officers are allowed to stay there for a short amount of time enough to conduct the protective sweep. In this case, the agents testified at trial that they stayed 40 to 50 minutes. They took pictures of boxes, moved a box, and their excuse for doing that is to say, well, you could have had somebody who's a threat hiding behind boxes. So the protective sweep itself was not a lawful protective sweep. And the other issue is that the search warrant that they eventually got was an illegal and invalid search warrant. And even if the warrant was a legal search warrant, the legal search warrant does not overcome the burden of entering the warehouse illegally in the first place. So he used false information to get a search warrant. And if Kerr consented, then there would have been no reason to get a search warrant. And the agency said, well, they did that out of an abundance of caution. And they actually told the magistrate judge who issued the search warrant that they were looking for someone in the warehouse who had been found. But again, even if the search warrant was legal, that does not allow the admission into the warehouse legally because there was no consent. Because of the interest of time, I would like to move on to issue six, if the court has no further questions on that issue. This is the loss amount that adjusted Mr. Danhock's sentence, 18 levels. Again, the burden is on the government here to prove the sentencing enhancement by a preponderance of the evidence. Here, the loss amounts in this case were based upon a ledger that was found in Mr. Kerr's car after Mr. Danhatch was arrested. Agent Shepard used Exhibit 36, and he counted 28 boxes of Prilosec that were obtained from CVS that would have been about $17.74 each. He also included shampoo. But there was no evidence in the record that there was stolen shampoo in the warehouse. And there was also testimony that the Prilosec that was witnessed in the was actually stolen. So at sentencing, Mr. Danhatch requested that the items for stolen baby formula or shampoo, items that were never proven to be stolen by any testimony at trial, would be subtracted from the loss amount. The district court denied, and he increased that level of enhancement by 18 without any proof of the loss. Now, we understand that in this case, the defendant would have a burden of offering evidence of a loss amount, and he did so by showing that the stolen baby formula or shampoo that was alleged stolen could not be attributed to him. But even before we get to that point, the government just proved the loss amount by speculation from ledgers that they say they found in Mr. Kerr's car. I want to move on to Issue 7, if there are no questions here. This is concerning the double jeopardy of the special assessment in this case. Under Kimbrough, if there are consecutive sentences, the Kimbrough case does not allow separate special assessments for consecutive sentences. So we're asking the court to reverse the $200 special assessment there. I want to go back and return to Issue 2, the aiding and abetment, a shipment of over-the-counter medicine from Maryland to Texas on August 26, 2011. This concerns a box that was found at FedEx, and the FedEx agent attributes this box to Mr. Danhatch. But there was no evidence that Mr. Danhatch had anything to do with the box. There was no evidence that a car rented by Danhatch traveled to Maryland, and there was no evidence that the goods in the box was even stolen. The items had store stickers remaining on them. They were shipped from someone named Jose Perez, who offered no testimony at trial, and they were addressed to Ninja. So when you look at the record as a whole and in totality, there's actually no evidence there to connect Mr. Danhatch to that transport of Federal Express on August 26, 2011. The same applies to Issue 3 when you look at Counts 3 and 4 for the interstate transport of stolen goods that would have occurred on February 24 and February 28 of 2012, as the government alleges. Of the three components of the conviction for it to stand, number three, the government would have to prove that the goods stolen were more than $5,000. Here, the government does not meet its burden. It expects the district court or the jury to convict Danhatch based on unstickered goods, and there was no testimony that he had anything to do with baby formula amounting to an amount of $5,000. In the brief, I offer the case United States v. Hannafie, which is on our fours with this case, where this court in 2002 reversed a similar conviction based upon insufficient evidence as we argue in this case. In order for the conviction to stand, the government would have to have proved that the goods were stolen, that they were worth more than $5,000. With respect to the number component... Your time is up. You have a little bit left for rebuttal. Thank you. I'm taking a zealous argument, and I can see you overlooking... Thank you for having me. May it please the Court, Amy Ellenise for the United States. I'd like to go over the facts that are in the record regarding the suppression issue. There were actually three different consents given here, and I would ask the Court to look at the government's Suppression Exhibit 9, which is a diagram of the warehouse. You will see that there is a front door that the agents approached. It's also visible on the video. That is a glass door. They stood there for a little bit. Keir came out after they knocked. He unlocked the door. He opens the door. He steps out. There is a very brief conversation. Then he admits the agents into this lobby area. Once they get into the lobby area, and on the video, Don Hutch had a very sophisticated security system in his warehouse. There are different cameras. There is a separate camera in the lobby. Sergeant Schneider and the other agents who testified said they went into the lobby, and they said, you know, we're here to do this investigation. They ascertained that he knew about the investigation. He knew that Don Hutch had been arrested just two days previously. They asked him, is there anyone else in the warehouse? They already partially knew an answer to that because they had been surveilling this warehouse for weeks. They had seen many boosters come and go with their black plastic trash bags full of items. That particular morning, they had seen Keir and an unknown man enter the warehouse. They suspected there was at least one other person other than Keir in the warehouse. As Sergeant Schneider testified, just because he indicated there was one person doesn't mean that I believe that. I needed to see for myself. So at that point, they asked him, can we look around? Can we look for this person? And he says yes. And on the video, you can see they're all standing around. Everyone's very relaxed. There's no yelling, screaming, nothing of that nature. And they're talking to Keir, and unfortunately, the video does not have any sound. But you can see this conversation, and then Keir points over his shoulder to the warehouse. And then there's more gesturing, and then they leave. They leave, and they walk through this little hallway. Keir at that point is leading them through this hallway to the warehouse, which is room F on that diagram. It's a very large room sort of in the back. Along the way, they pass by various little rooms and offices, and they see some products being, looks like they're being packed up for shipment. They walk into the warehouse, and it's a very large room. And you can see on the video shots, and I think also the still pictures will show this too. Over, particularly on the right side of the warehouse, there is just a massive amount of these OTC products that they know that the boosters steal. And the agents also knew a lot of other stuff about Mr. Keir and Mr. Don Hutch at this point. They knew that Keir and Don Hutch had been involved in stealing and reselling these products. And they knew that they were going to get a lot of money from Walmart. You're just, just to get to the legal point, you're saying consent number one, entry. Consent number two, go find anybody else here. What's the third point of consent? The third consent is that they get around and they get to the warehouse, and immediately they know what's going on here. And so they do a brief protective sweep because they say there are, and you can see this on the video, there's some places where people could have been hiding. Then they asked Don Hutch for consent to search the warehouse. And he does, he gives verbal consent. And there's many, many, I guess just the, I mean, the brief analysis, it does describe those three moments of consent. He doesn't sign the consent form, but it was the agent's testimony that he actually gave it written consent form, which is generally FBI policy. They like to have a written consent form. And so, but then he waffles and he says, never says, I won't sign. He said, I would like to talk to my attorney. So they, they start talking to him about that. He says he wants to call his attorney. They let him call his attorney. And what's the government suggested if you, what would you say, affirm this because there's articulable facts to support reasonable suspicion of danger, hence sweep, plain error, even as to toolbox and opening up box flaps or consent for the whole thing? I think it's consent for the whole thing because they had consent to go in and do the protective sweep. And they also had... Did Schneider at any point ever say, I didn't do this because of consent? Did you remember? He never said that in his testimony. And the appellant complains that they had an ulterior motive. Well, the Supreme Court has said it doesn't matter when you're going to do a knock and talk. That's a, that's a valid investigatory technique and a subjective motivation simply doesn't matter if the, if a voluntary consent is given. What would be the closest protective sweep in a crime charge like this with the facts presented that would still be reasonable suspicion to fear, to have fear for? What's your best protective sweep case if we did go there? I think the best, I mean, we don't have anything with facts exactly like this one. I think the best one is Mendes. That was handed down by this court in 2005. And that's where the agents learned that there are some aliens being harbored at a certain residence in Dallas. And they go there and they approach a door to, to knock and talk. And they know some things about that guy too. They know he's a Cuban immigrant living there and they know a few other things about him. But they walk up, the, the screen doors close, other doors open. They knock, he comes and they say, well, we, you know, we're here because we've heard that you're, you've got some aliens here. And he says, no, it's just me. At what point did they take pictures? They took the pictures after he, Keir had given the verbal consent. And some of the officers, and then they get the form and they're talking to him about that. Several of the, or I guess it's the FBI agent, goes and he snaps a couple of pictures. They think they have verbal consent. So they end up snapping four pictures. And you do, did they ask consent to take pictures? They, they just took the pictures. At that point, Judge, he had, they had verbal consent to search the warehouse. So I would think taking a few pictures. Consent to search the warehouse. Yes. And they said we, we were snapping photographs so that we could remember and we could be accurate in our affidavit. They had decided at that point that they were going to go the, the search warrant, just to be cautious. And they wanted to make sure they were going to be accurate. Sergeant Snyder also testified, I knew when I walked in that, that warehouse what was going on. I believed I'd come in. And I assumed that the consent was then that whatever one might see, the entry in pursuant to that consent would be permissible. But I was wondering what the scope of the consent was, to go through and take pictures and to start, it's, when you start taking pictures, it looks like you're gone, you're not just coming in, you're essentially, you make, you know, may I come in? Yes, you can come in. And then, of course, anything you see is fine. And I assume that then, now that you can take pictures, but at some point, you're taxing consent pretty hard when the agents come in with no warrant and they start taking pictures, et cetera, then those become a basis for the warrant itself. Or is that just an aid to prove a memory of? Well, I think, Judge, he did, again, there were three consents. Consent to enter the lobby, consent to go to the warehouse and do the protective sweep, followed by verbal consent to search the warehouse. And the agents were simply taking pictures of things. Verbal consent to enter the warehouse, that's what. May we search the warehouse? The second, the second request was, we want to come and see who's in the warehouse. Can we come in and look around? Come in and look around. That sounds a little more familiar. And that, that's, I mean, I'm not suggesting that's not enough, but I'm just asking, can they come in and look around? I wondered if there is any limitation to this, to, it takes, it takes in the look of more, of a really determined search when you start to, to take photographs and, and to, to gather evidence, which that's what that is. Well, the, they only took four photographs because the camera never failed. Oh, just four and that became the basis of the warrant. They did not, they were not attached to the affidavit. The agents used those to just refresh their memory. I thought, I thought somebody testified that they looked at the pictures in order to identify material to put into the warrant. That's true, but it was all in plain view. They had seen everything. There was one exception. I'm going to be careful I don't misrepresent this. Pardon me? It was in plain view after they took the pictures, for sure. I'm sorry, Judge, I'm not hearing you. I'm sorry, I don't have my mic over here out of the way. I said they were certainly in plain view in the pictures. Yes, they were in plain view in the warehouse, too. There's one exception. That's the toolbox. Schneider admitted that he lifted up the lid of this toolbox and they didn't even mention that. The answer to my question is it's really not the question that is consent. I frankly say if you, if they're there for the right, taking the pictures may not change the dimensions of that, but it does tax me sorely that your alternative argument about a protective search, these guys in there walking all over and they took pictures and... Well, I don't, we're not arguing that the picture taking was part of the protective sweep. The protective sweep was right when they got there. You briefed it in your argument. I guess you rightly are accenting your consent. Exactly. It was simply an alternative to the consent. Thank you. At any rate, I wanted to clear up that toolbox photo. Schneider admitted that he did open up the box, but it didn't contain anything relevant. They didn't even mention it in the affidavit. That was not part of obtaining the search warrant at all. The 1512 convictions, the obstruction, what was the basis? Was that, was the only basis for those convictions, the Pinkerton theory? On Count Foth, which charged, this was the ledger, Keir, the co-defendant, him, the guy who was there at the warehouse that day. Don Hutch had been arrested on February the 27th. The police arrested him at his townhome. Shortly thereafter, the landlord testifies to this. Keir shows up and he's, and the landlord sees him. What are you doing here? Who are you? I'm here to pick up Saud's paperwork. Don Hutch rented the townhouse under another name. And so the landlord actually made him sign a paper saying, I have permission and leave a copy of his driver's license. And the landlord said it was this black bag and it had papers. The landlord wanted to see what was in there. And this black bag, a black Gucci bag full of business ledgers was found in Keir's BMW that was parked outside the warehouse the day of the search. And our theory on that is Pinkerton. Do you have any case where, where you can get a substantive 1512 conviction based on Pinkerton? I could not find one. That's because almost any conspiracy is going to have people hiding stuff. And so that's a broad use of Pinkerton. Perhaps, but you have to look at the background of these two guys. They went way back and they were very deep in this conspiracy. Keir was a major player. He had. You had a lot of proof of the conspiracy. No question about that. It's just then to say, well, Keir does an obstruction. Danahack gets the substantive guilt on that because it would be foreseeable. Anybody in the conspiracy might destroy evidence. That's the theory. I don't know if it would be conceivable that anybody in that conspiracy, but certainly Mr. Keir, because he was. What did the phone calls made from the, from the, from jail, I guess, do in terms of addressing the, the, the destruction of the evidence? That was. You're, you're pushing Pinkerton a little hard on the obstruction of justice count. I want you to flesh that out a little bit. What about what actually happened here? You argued in your brief that there were phone calls in which they were plainly signaling them to get rid of the, of the hard drive, et cetera. Can you tell me what those were? Certainly, Your Honor. Let me check my notes. I don't want to say anything wrong. Count, this was a different count. This is count six. This involves the removal and concealment of the hard drive. Basically, the officers arrive sometime like around, I don't know, they arrive, they leave to go get the search warrant. There are only two agents remaining. Keir and, Keir and Don Hutch have this phone conversation and it's, at first they're discussing a shipment of baby formula and then Keir starts talking in code and this whole conversation is in Arabic. They were, he refers to Al-Gardel and Al-Kanaka, which is apparently, sorry, it's, it's Al-Gardel and Al-Kanaka. It's two characters from a very famous Egyptian movie that apparently everybody in the Arab world knows about. It's a famous, famous movie. And so, It escapes me. I haven't seen that movie, so. Me neither. I missed it. But, My Arabic's a little weak. Mine too. We had a very talented linguist translate that, all that stuff for us. But anyway, this is a reference to the video and Don Hutch says, tells him to remove it, quote, put them far apart from each other. Do you know what I mean? He asked him, do you know how? And then there's a reference to the ceiling or the attic. It hasn't been working and was uh-huh. And so, Keir locks the warehouse front door at 122. There's a, I know there's a still photograph of that in the government's exhibits. Then there was a blip in the tape, the video tape, which the agent said could have been caused by someone tampering with the hard drive. There's a second call between the two and Don Hutch is in jail. So, of course, these were all recorded. Don Hutch tells him, make sure it's done. Do what I'm telling you. They'll search you when you leave. Make sure you do what I told you. And then the cameras become, the hard drive becomes inoperable at 137. So, that's basically our theory on that and that was really an aiding and abetting theory on that one. Not so much Pinkerton, although I suppose you can make that argument too. What, getting back a little bit to Judge McClellan, there are a few limits you have tossed out, perhaps because of the closeness between these two individuals, centrality to the conspiracy, this foreseeability of destruction of the ledgers, effort to hide the ledgers could be foreseeable. It does seem to me that were we to uphold that part of the conviction, if we uphold any of it, if we uphold that part of the conviction, it is creating sort of a beacon for prosecutors that maybe we need to do this more often. Well, I am part of Judge Higginson's prosecutorial background about how unusual that is. Is there a limit in your view and is this an appropriate thing for us to be authorizing? Well, again, Judge, I think Pinkerton all turns on reasonable foreseeability. And again, when you look at the close connection of these two men and how close they were in this conspiracy, they both had a lot to lose if the FBI got a hold of those ledgers. And I think for that reason. Is there record keeping for the conspiracy? These ledgers are the primary source of information for them, for the conspirators and their operation? There are also some computer files, but apparently this is how Don Hatch initially kept his records and he would later transfer them into the computer. But I wouldn't say, I don't know if it's the primary, but it's certainly a very important piece of evidence. But under Pinkerton, anyone in the conspiracy could be substantively liable. Well, again, I think that's subject to the reasonable foreseeability. We also indicted some of the boosters, but. Well, it would be reasonably foreseeable to any co-conspirator that another one would try to destroy evidence that incriminates them. Well, I think that not necessarily all the co-conspirators would have had access to Don Hatch's townhome. Only Cure did that. Some of the boosters theoretically didn't even know where the warehouse was. The closing argument was their focus on this point, do you remember? On which point in particular? On reasonable foreseeability as to count five, this ledger, Don Hatch owns the apartment or rents it or whatever. Therefore, ladies and gentlemen, you've got enough to infer. I do not remember that. I just can't remember that particular point in this very long record, but I do know that the jury was instructed. I'd be surprised if the prosecutor didn't make the argument, the standard argument, really, that ladies and gentlemen, that his honor is going to instruct you, that da, da, da, da, da, and give them Pinkerton again. Aiding and abetting, your answer earlier to me, I'm not sure it solves the problem under general charge. Does it? I'm sorry, say that again. Aiding and abetting. You said, well, that's relevant to aiding and abetting. How does that answer, is that a complete answer to the question of whether or not this is reasonably foreseeable under Pinkerton? That you have an alternate form of, that also is dependent upon the same kind of requisite culpability. Are you speaking of count five, which was the ledgers, or do you, oh. Yeah, it's the same thing we've been talking about, about aiding and abetting. You said aiding and abetting in response to my question about suggesting you're pushing Pinkerton pretty hard with regard to obstruction of justice and the destruction of these counts. I think Pinkerton's helpful. And then your answer to that, you gave me evidence of that, which is helpful, but in terms of the charge itself, I didn't follow your suggestion that, well, that went to aiding and abetting. I don't think we had any aiding and abetting theory as to count five. I'd like to see, I wouldn't look at the charge, but I would anticipate that the usual instruction in these cases is going to be a standard instruction on aiding and abetting. Yes, that was given, and the standard Pinkerton was given. It's not in particular geared to count five, count six, it's whatever. It is a general charge to govern the whole case, and the jury uses that as it may. I think that is correct, Your Honor, and I do not know the answer about the closing argument, but I'd be happy to submit a supplement. We have the closing argument. We'll make the request if we need it. For now, we're fine. All right, I'd just like to rely on my brief for the rest of it. Thank you. I wanted to address the issue of consent and just touch on some of the things that the government proposed based upon the record. When you look at the record, page 1480, Agent Schneider testifies. He says, Care opened the door of the warehouse, and we just walked in. At another place, page 1480 of the record, Agent Schneider again says, there was a short window of time when Care came to the door and unlocked it. So there was a very, very short window of time there, and again, when you go back to the video, you'll see the agents just walking past Mr. Care to get into the hallway there. And then, when pressed further, on cross-examination, same page, page 1480 of the record, Agent Schneider stated that Care opened the door, and then the agents simply walked in and began talking to Care. And again, I think that although there's no verbal or audible language to the video, once you see the video, it will become very clear to the court that once he unlocks the door, Agent Schneider simply walks around him and goes in, and those three people- Well, the agent acknowledged, I thought, in cross-examination that his earlier recollection was mistaken at who went in first. Right. He acknowledged that he went in first after he saw the video. Right, right. And then so he said that within, again, Agent Schneider, that within five minutes of walking to the warehouse, he asked for consent to search the warehouse. But again, when you look at the video, you will see that Agent Schneider walks in front of Mr. Care, and he actually enters the door of the warehouse first. So the video makes it very, very clear that there was- I understand your point. It seems to me on opening, you were suggesting, and it seems to me what you are now, that the video indicates that there was not enough time for all the conversation that the officers were indicating. Exactly. May we come in? Couldn't have been said. They were already there. Is that- Exactly. The disconnect between what we see on the audio and what the testimony is, is that the point that we need to take from what you're saying? Yes, Your Honor. I reviewed the video in preparation for oral argument, and again, I think that when you look at the video, you will see that there is not much time for conversation, as you just said. And with respect to the black Gucci bag, there is no evidence under Pinkerton that this would be reasonably foreseeable to Mr. Dunhatch because he was already incarcerated. Mr. Care did not say anything to the landlord that Dunhatch asked him for permission. As a matter of fact, it was the landlord that proposed that Mr. Care sign something saying that he was going to take that bag and that he was there. The same thing with respect to the obstruction of justice on the hard drive. Here, the chief evidence from the government is the testimony of their own FBI analyst, Ms. Mona Nash. And basically, she testifies that she translated the phone calls. They were speaking in a foreign language. She concluded that they were speaking in a code based upon a movie. Then she says even the code itself, record page 3008, was vague. And she says she believes that they're discussing something. And belief does not amount to the standard, does not meet the standard of reasonable doubt here. But she says ultimately that she really can't conclusively say what they're talking about and if they're actually speaking about hiding evidence at all. The Pinkerton charge was a pattern charge. No objection to the charge. I'm not sure if there was an objection to the charge. There was a Rule 29 motion. Did you know if it was particularized by count? Did it say specifically no foreseeable? I can't say at the time. I know that there was a motion for acquittal after the close of the government. And then there was also a subsequent motion. But at this moment, it escapes me. So I could report back if the court mandates. Thank you for your time. Well, counsel, thank you.